IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS

| | |
|---|---|
| FREDERICK STEWART #R74349, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| vs. | ) Case No. 20-CV-1082-SMY |
| | ) |
| DEANNA BROOKHART, et al, | ) |
| | ) |
| Defendants. | ) |

# MEMORANDUM AND ORDER

**YANDLE, District Judge:**

Plaintiff Frederick Stewart, an inmate in the custody of the Illinois Department of Corrections ("IDOC"), filed this lawsuit pursuant to 42 U.S.C. § 1983. He claims that the defendants were deliberately indifferent to his serious medical needs for a congenital heart issue at Lawrence Correctional Center, in violation of the Eighth Amendment, and that they committed state law medical malpractice in treating the same (Doc. 19). Stewart also claims retaliation.

The case is before the Court for consideration of two motions for summary judgment: the Motion for Summary Judgment of the Wexford Defendants Trina Canada (Swinson), Carissa Lurking, Deena Seed, Dr. Vipin Shah, Amy Thurman, and Pam Ward (Doc. 104); and the Motion for Summary Judgment of IDOC Defendants Dee Dee Brookhart, Logan Greentree, and Tony Harmon (Doc. 108). Plaintiff responded in opposition to the motions (Docs. 110, 137). For the following reasons, the summary judgment motions of the Wexford Defendants are **GRANTED** in their entirety and the summary judgment motions of the IDOC Defendants are **GRANTED in part**.

### Factual Background

The following facts are undisputed unless otherwise noted and taken from Plaintiff's

depositions, party affidavits, and 893 pages of medical records: Plaintiff suffers from a heart condition called Ebstein's anomaly, a "rare heart defect where the tricuspid valve is in the wrong position and the valve's flaps are malformed" (Doc. 105-6 at ¶ 7).  He has been a cardiac patient for 38 years (Doc. 105-2 at 38:12-13).  Prior to his incarceration in April 2017, he treated with a private cardiologist, Dr. DeFrietas (Doc. 105-2 at 11:23-12:9).  Plaintiff arrived at Lawrence Correctional Center on or about October 3, 2019 (Doc. 108-1, p. 2).  The record does not contain an initial medical assessment and chart review upon his transfer (Doc. 105-7 at ¶ 5).

On October 17, 2019, Plaintiff saw R.N. Ward and denied shortness of breath, dizziness, or significant pain (Doc. 105-12, pp. 10-11).  R.N. Ward had Plaintiff undergo an electrocardiogram (EKG) (Doc. 105-12, p. 36) and referred the EKG results to N.P. Luking for further assessment (Doc. 105-12, p. 11).  Dr. Pittman had the EKG filed in Plaintiff's chart (Doc. 105-12, p. 37).

On December 3, 2019, Plaintiff saw Dr. Pittman on the Medical Doctor Call Line and they discussed Plaintiff's heart condition (Doc. 105-6 at ¶ 7).  Dr. Pittman referred to a May 2019 EKG that showed an "improved EF [ejection fraction] of 24% to 40%" (Doc. 105-12, p. 12).  Dr. Pittman prescribed medication (Losartan and Aspirin) and ordered twice daily blood pressure checks for one week and once a day for eight weeks (Doc. 105-12, p. 12).

On December 17, 2019, Plaintiff saw R.N. Seed with complaints of chest pain, palpitations, headache, and dizziness (Doc. 105-12, p. 14).  R.N. Seed noted that Plaintiff was not sweating heavily, was not short of breath, had no abnormal vital signs, and had pain of 2 on a scale of 1-10 (Doc. 105-12, pp. 14-15).  Plaintiff underwent EKG on that date (Doc. 105-12, p. 54) and another the following day (Doc. 105-12, p. 58).  R.N. Seed received physician orders to increase the Aspirin amount and to have Plaintiff follow up with a physician at a later time (Doc. 15-12, p. 15).

On January 31, 2020, Dr. Pittman referred Plaintiff to Carle Richland Hospital in Olney, Illinois after Plaintiff complained of shortness of breath and chest pains (Doc. 105-12 at pp. 1-3). Plaintiff underwent an EKG on that date (Doc. 105-12, p. 60).

On February 20, 2020, Plaintiff went to the Health Care Unit and self-reported having a "small stroke" to R.N. Seed (Doc. 105-13, p. 66). She assessed Plaintiff and observed no neurological defects, equal grips, raised eyebrows, equal foot strength, and a symmetric smile (Doc. 105-13, p. 66). R.N. Seed concluded that there were no signs that Plaintiff had suffered a small stroke (Doc. 105-13, p. 66) and instructed Plaintiff to return to see the provider if his symptoms worsened or interfered with daily functioning. Plaintiff returned the next day and related that he felt better (Doc. 105-13, pp. 66-67).

On March 3, 2020, Plaintiff complained that he "might pass out." C.O. Harmon took him to see R.N. Canada (Doc. 105-16, p. 24). After Plaintiff saw the nurse, he began laughing. R.N. Canada noted in the medical record that Plaintiff "[appeared] to be playing games" (Doc. 105-16, p. 24). Plaintiff refused to take any medication that day and was aggressive and hostile toward R.N. Seed (Doc. 105-16, pp. 27-28).

On March 12, 2020, while in the infirmary, Plaintiff refused to have his vitals taken, yelled at the nursing staff, and threatened to have them written up for breaking HIPAA (Doc. 105-15, pp. 44-45). He refused again on March 13, 2020 (Doc. 105-15, pp. 47-49). Around this time, Plaintiff wrote numerous grievances and Defendant Brookhart allegedly had Plaintiff removed from the infirmary (Doc. 108-3 at 9:8-19).

On March 24, 2020, Plaintiff self-reported heart palpitations to R.N. Canada (Doc. 105-16, p. 5). He had an EKG taken (Doc. 105-12, p. 62). R.N. Canada took his vitals and later called Dr. Pittman, who ordered Plaintiff to be sent to the emergency room for evaluation and treatment (Doc.

105-16, p. 6). Canada notified the shift commander of the need for an ambulance at 12:59 p.m. and Plaintiff left the facility via an ambulance at 1:30 p.m. (Doc. 105-16, p. 6). Plaintiff had numerous EKGs on March 31, 2020, April 3, 2020, April 7, 2020, and April 21, 2020 (Doc. 105-12, pp. 74-80). R.N. Seed treated him again on March 25, 2020 and attempted to call Dr. Pittman twice (Doc. 105-16, pp. 12-13).

Throughout the spring of 2020, Plaintiff was uncooperative with medical staff, including refusing to have his vitals taken and refusing medications (Doc. 105-17, pp. 38-39, 43, 45).

On June 26, 2020, Plaintiff self-reported heart palpitations to R.N. Canada (Doc. 105-19, p. 8). She took his vitals. Plaintiff refused to take his vitals a second time a few hours later (Doc. 105-19, pp. 8, 10). Subsequently, Plaintiff voiced no complaints (Doc. 105-19, p. 14).

On July 19, 2020, Plaintiff again self-reported chest pains and R.N. Canada took his vitals (Doc. 105-19, p. 84). Afterward, Plaintiff voiced no complaints (Doc. 105-19, p. 86).

On July 23, 2020, Plaintiff saw Dr. Shah while in the infirmary with complaints of chest wall pain (Doc. 105-20, p. 7). This was Dr. Shah's first treatment of Plaintiff (Doc. 105-6 at ¶ 59). Dr. Shah observed that Plaintiff was in no distress and his vitals were normal (Doc. 105-6 at ¶ 59).

On July 29, 2020, Dr. Shah saw Plaintiff in the infirmary. Plaintiff self-reported waiting for a heart transplant (Doc. 105-20, p. 27). Dr. Shah determined that it was not medically necessary for Plaintiff to remain in the infirmary as his condition was stable and ordered Plaintiff to be placed in a cardiology chronic clinic instead (Doc. 105-6 at ¶ 60).

On August 18, 2020, Plaintiff visited his offsite cardiologist, Dr. DeFrietas (Doc. 105-15, p. 6). Dr. DeFrietas ordered Plaintiff to wear a Ziopatch, or an ambulatory cardiac monitor that records the heart's rhythm for two weeks (Doc. 105-15, p. 6).

On August 22, 2020, Dr. Shah noted in Plaintiff's chart that he had spoken with the

placement office about moving him closer to his cardiologist (Doc. 105-20, p. 83). Dr. Shah also ordered bloodwork and put in a medical referral for Plaintiff to receive the Ziopatch (Doc. 105-6 at ¶ 72).

Plaintiff became uncooperative on follow visits, including refusing medications on August 23, 2020 (Doc. 105-20, p. 84), refusing to be seen with the Medical Call Line Center on August 25, 2020 (Doc. 105-20, p. 85) and September 7, 2020 (Doc. 105-20, p. 87), and returning his monitor to medical on September 4, 2020 (Doc. 105-20, p. 85). On October 8, 2020, Plaintiff was transferred to Stateville Correctional Center (Doc. 108-1, p. 1).

Plaintiff declared hunger strikes at Lawrence, which are interspersed through the medical records. He sought to "bring attention to the negligent care" that he was receiving (Doc. 105-2 at 37:17-21). On December 17, 2019, Plaintiff declared a hunger strike (Doc. 105-12, p. 16), but terminated it a day later (Doc. 105-12, p. 18). A discharge summary from December 19, 2019 indicated that he had finished his hunger strike after agreeing that his vitals would be checked daily and his prescriptions would be modified (Doc. 105-12, p. 25). Plaintiff was on hunger strikes again from approximately December 23, 2019 to December 25, 2019 (Doc. 105-12, pp. 26-29) and again from May 5, 2020 to May 12, 2020 (Doc. 105-18, pp. 4, 16). Other hunger strikes were of uncertain but short duration. After Plaintiff declared one hunger strike, C.O. Greentree wrote Plaintiff a "ticket for refusing housing and disobeying a direct order," resulting in Plaintiff being placed in segregation (Doc. 108-3 at 24:23-25:7). C.O. Greentree acknowledges writing Plaintiff a ticket but states it was because "Plaintiff refused direct orders" (Doc. 108-6 at ¶ 6).

## **Discussion**

Summary judgment is proper if the moving party can demonstrate that there is no genuine issue as to any material fact — that is where the non-moving party "has failed to make a sufficient

showing on an essential element of her case with respect to which she has the burden of proof." Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett,* 477 U.S. 317, 322-323 (1986). If the evidence is merely colorable or is not sufficiently probative, summary judgment should be granted. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 249-50 (1986). Any doubt as to the existence of a genuine issue of material fact must be resolved against the moving party. *Lawrence v. Kenosha County,* 391 F.3d 837, 841 (7th Cir. 2004).

## **Wexford Defendants**

Plaintiff is proceeding on two claims against the Wexford Defendants:

> Count 1: Eighth Amendment claim against Nurse Ward, Nurse Practitioner Lurking, Nurse Seed, Nurse Swinson, Nurse Thurmond, C/O Harmon, Dr. Shaw, Brookhart, Cunningham, and C/O Greentree for deliberate indifference to Plaintiff's serious medical needs by denying him medical treatment and/or proper monitoring and/or providing inadequate medical treatment for chest pain, heart palpitations, low blood pressure, high blood pressure, low heart rate, angina, arrhythmia, pain, atrial fibrillation, ventricular tachycardia, and supraventricular tachycardia.
>
> Count 6: State law medical negligence claim against Nurse Ward, Nurse Practitioner Lurking, Nurse Seed, Nurse Swinson, Nurse Thurmond, and Dr. Shaw for denying Plaintiff medical treatment and/or proper monitoring and/or providing inadequate medical care for chest pain, heart palpitations, low blood pressure, high blood pressure, low heart rate, angina, arrhythmia, pain, atrial fibrillation, ventricular tachycardia, and supraventricular tachycardia.

(Doc. 19, pp. 4-5).[1]

The Eighth Amendment prohibits deliberate indifference to the serious medical needs of prisoners. *Machicote v. Roethlisberger,* 969 F.3d 822, 827 (7th Cir. 2020) (citing *Estelle v. Gamble,* 429 U.S. 97, 104 (1976)). A plaintiff asserting such a claim must offer evidence that he suffered from an objectively serious medical condition, and that the defendant actually knew of

---

[1] Plaintiff did not disclose a medical expert and did not file an affidavit stating that there is "reasonable and meritorious cause" for the litigation with an attached physician's report as required by 735 ILCS § 5/2-622. Consequently, his state law medical malpractice claims (Count 6) will be **DISMISSED**.

Page **6** of **14**

and disregarded a substantial risk of harm. *Murphy v. Wexford Health Sources Inc.,* 962 F.3d 911, 915 (7th Cir. 2020).

"Deliberate indifference is not medical malpractice; the Eighth Amendment does not codify common law torts." *Roe v. Elyea,* 631 F.3d 843, 857 (7th Cir. 2011). Thus, courts will not interfere with a doctor's decision to pursue a particular course of treatment unless that decision represents so significant a departure from accepted professional standards or practices that it calls into question whether the doctor actually based their decision on such a judgment. *Id*. With respect to ongoing treatment, a court should examine the totality of care the prisoner received to determine whether he received adequate medical care. *Walker v. Peters*, 233 F.3d 494, 501 (7th Cir. 2000) (ongoing treatment of AIDS and hemophilia was adequate overall despite an inmate's dissatisfaction). When a plaintiff alleges a delay in medical care as evidencing deliberate indifference, he "must place verifying medical evidence in the record to establish the detrimental effect of delay in medical treatment." *Langston v. Peters*, 100 F.3d 1235, 1240 (7th Cir. 1996).

**Defendant Vipin Shah, M.D.**

Plaintiff claims Dr. Shah improperly removed him from the infirmary and denied him proper treatment and monitoring for his heart condition. Dr. Shah did not treat Plaintiff until July 23, 2020, when he noted that Plaintiff's vital were normal and he was in no distress. Dr. Shah saw Plaintiff in the infirmary on July 29, 2020 and determined that it was not medically necessary for Plaintiff to remain there as his condition was stable. He also treated Plaintiff by ordering EKG readings, placing Plaintiff in the infirmary again, and implementing the recommendations of Plaintiff's outside cardiologist. Eventually, Dr. Shah had Plaintiff transferred to the general population when his condition stabilized.

In sum, the evidence demonstrates his disagreement with Dr. Shah's treatment plans. But this evidence alone is insufficient to support an Eighth Amendment claim. *Snipes*, 95 F.3d at 592 (7th Cir. 1996). Therefore, summary judgment will be granted on Plaintiff's claim against Dr. Shah.

### Carissa Luking, N.P.

Plaintiff claims that N.P. Luking improperly read his EKG on October 17, 2019 and failed to send him to further monitoring. By affidavit, N.P. Luking attests that she is qualified to review EKG readings and that she would have referred Plaintiff to be seen on an urgent basis if his EKG had necessitated it (Doc. 105-10 at ¶¶ 7-8). Plaintiff has provided no evidence establishing that his EKG reading merited further monitoring, much less that N.P. Luking's treatment was a substantial departure from professional norms. *Donald v. Wexford Health Sources,* 982 F.3d 451, 458 (7th Cir. 2020). Therefore, summary judgment will be granted on Plaintiff's claims against N.P. Luking.

### Pam Ward, R.N.

Plaintiff asserts that R.N. Ward lied and told him that she had showed his EKG to Dr. Pittman on October 17, 2019 and that he had indicated it was normal. He further asserts that R.N. she altered doctor's notes to require him to undergo blood pressure checks daily instead of twice daily blood pressure checks and also altered vital sign results. Based upon the evidence on record, Plaintiff cannot establish that the EKG was abnormal, much less that R.N. Ward departed from professional norms in evaluating it. *Donald,* 982 F.3d at 458 (7th Cir. 2020). And while Plaintiff claims R.N. Ward altered doctor's notes and vital sign reports, he proffers no evidence to these claims. R.N. Ward is entitled to summary judgment as well.

### Amy Thurman, R.N.

Plaintiff asserts that Defendant R.N. Thurman covered his infirmary cell door with a "brown board" when he complained of chest pain or heart issues (Doc. 105-4 at 26:1-17). Thurman recalls that Plaintiff's infirmary isolation cell window was likely covered by a privacy screen, which she did not place (Doc. 105-8 at ¶ 9). According to Thurman, this privacy screen did not limit Plaintiff's interactions with the staff as there were cameras to monitor his status (Doc. 105-8 at ¶ 9). Thurman sparingly treated Plaintiff and contacted Dr. Pittman several times on February 12, 2020, March 30, 2020, and April 7, 2020 to note that Plaintiff had complained about heart palpitations (Doc. 105-8 at ¶¶ 6-7).

Even viewed in the light most favorable to Plaintiff, the above evidence does not establish that the privacy screen or Thurman's treatment was inappropriate or rose to the level of deliberate indifference. *Donald,* 982 F.3d at 458 (7th Cir. 2020). Accordingly, summary judgment will be granted on Plaintiff's claim against Defendant Thurman.

### Deena Seed, R.N.

Plaintiff asserts that R.N. Seed failed to inform the doctors and follow protocol when he had palpitations on December 17, 2019, and when he had a purported stroke on February 20, 2020. With respect to Plaintiff's treatment on December 17, 2019, R.N. Seed received orders to change Plaintiff's aspirin prescription of Aspirin and did so. There is no evidence to support a finding that Seed's actions were a substantial departure from accepted medical practice. Similarly, although Plaintiff claims he had a stroke on February 20, 2020, R.N. Seed examined him on that date and did not find any signs of a stroke, despite checking his grips, eyebrows, foot strength, and symmetric smile (Doc. 105-9 at ¶ 7). Plaintiff cannot establish that this care was deliberately

indifferent to his medical needs. *Donald,* 982 F.3d at 458 (7th Cir. 2020). As such, R.N. Seed will be granted summary judgment.

### Trina Canada (Swinson), R.N.

Plaintiff alleges that, on occasion (although he could not recall dates), R.N. Canada did not call doctors when his blood pressure was low or heart rate was "off" (Doc. 105-4 at 72:6-73:20) and that sometime in March 2020, he passed out and R.N. Canada did not treat him immediately (Doc. 105-4 at 26:21-27:6; 81:9-82:22). According to Canada, she treated Plaintiff on March 24, 2020, June 26, 2020, and July 19, 2020, during which Plaintiff self-reported heart palpitations (Doc. 105-11 at ¶ 6). The medical records indicate that Canada called Dr. Pittman on March 24, 2020, and that Plaintiff refused vitals on the other two days (Doc. 105-11 at ¶ 6). Absent evidence that this treatment was a substantial departure from medical standards, R.N. Canada will be granted summary judgment. *Roe,* 631 F.3d at 857 (7th Cir. 2011).

Plaintiff also alleges that the Wexford Defendants were deliberately indifferent to his medical needs by failing to have him appropriately evaluated when he arrived at Lawrence (Doc. 105-4 at 29:16-20). But his basis for these evaluations are internal protocols (Doc. 105-4 at 30:20-22), which cannot support deliberate indifference. *Scott v. Edinburg*, 346 F.3d 752, 760 (7th Cir. 2003).

### **IDOC Defendants**

Plaintiff is proceeding on two claims against the IDOC Defendants:

Count 1: Eighth Amendment claim against Nurse Ward, Nurse Practitioner Lurking, Nurse Seed, Nurse Swinson, Nurse Thurmond, C/O Harmon, Dr. Shaw, Brookhart, Cunningham, and C/O Greentree for deliberate indifference to Plaintiff's serious medical needs by denying him medical treatment and/or proper monitoring and/or providing inadequate medical treatment for chest pain, heart palpitations, low blood pressure, high blood pressure, low heart rate, angina, arrhythmia, pain, atrial fibrillation, ventricular tachycardia, and supraventricular tachycardia.

>Count 4: First Amendment retaliation claim against Warden Brookhart for authorizing his placement in segregation, ordering his release from the health care unit, and authorizing the issuance of disciplinary tickets in retaliation for a grievance Plaintiff submitted about mental health care and for complaining about his conditions of confinement by declaring a hunger strike and against C/O Greentree for issuing disciplinary tickets for Plaintiff complaining about his conditions of confinement by declaring a hunger strike.

(Doc. 19, pp. 4-5).

### Dee Dee Brookhart

Plaintiff testified that he told Defendant Brookhart that he was not receiving proper medical treatment and is suing Brookhart in her supervisory role for preventing him from receiving it. He also alleges that Brookhart did this in retaliation for him filing excessive grievances about his medical treatment and that had him placed in restrictive housing or authorized issuance of disciplinary tickets.

The First Amendment prohibits prison officials from retaliating against inmates for filing grievances, lawsuits, or otherwise complaining about their conditions of confinement. *Gomez v. Randle,* 680 F.3d 859, 866 (7th Cir. 2012). Plaintiff must demonstrate that "(1) he engaged in activity protected by the First Amendment; (2) he suffered a deprivation likely to deter such activity; and (3) the First Amendment activity was at least a motivating factor in the decision to impose the deprivation." *Hawkins v. Mitchell,* 756 F.3d 983, 996 (7th Cir. 2014). "The 'motivating factor' amounts to a causal link between the activity and the unlawful retaliation." *Manuel v. Nalley,* 966 F.3d 678, 680 (7th Cir. 2020).

There is no supervisory liability in a § 1983 action – a defendant must be "personally responsible for the deprivation of a constitutional right." *Sanville v. McCaughtry,* 266 F.3d 724, 740 (7th Cir. 2001). Even crediting Plaintiff's assertion that Brookhart was personally responsible for Plaintiff's medical care, the totality of his care while at Lawrence does not support a finding of

deliberate indifference. *Walker*, 233 F.3d at 501 (7th Cir. 2000). As noted in Dr. Shah's lengthy affidavit (Doc. 105-6) and over 800 pages of medical records, Plaintiff received continuous and extensive medical treatment while at Lawrence, including offsite visits to a hospital and his pre-incarceration cardiologist. And he has not established that any of this care worsened his condition or involved unnecessary pain or delay. *Langston*, 100 F.3d at 1240 (7th Cir. 1996). Thus, Defendant Brookhart will be granted summary judgment with respect to Plaintiff's deliberate indifference claim against her.

However, Plaintiff testified that he repeatedly filed grievances and was removed from the infirmary whenever this happened at the behest of Defendant Brookhart. On this evidence, a jury could reasonably infer that Plaintiff was removed from treatment or placed in restrictive housing to curtail his filing of grievances. *Babcock v. White,* 102 F.3d 267, 275-276 (7th Cir. 1996). Therefore, material issue of facts exist as to whether Defendant Brookhart retaliated against Plaintiff for filing grievances. Summary judgment will be denied on this point.

### Logan Greentree

In his Complaint, Plaintiff alleged that Logan Greentree, a correctional officer at Lawrence, refused to call for medical attention when Plaintiff requested it. But in his deposition, Plaintiff admitted that Greentree contacted medical to answer Plaintiff's questions about whether his prescriptions had expired and a "nurse came out to tell [Greentree] what is going on with [Plaintiff's] medications (Doc. 108-3 at 25:16-24). In light of the lack of evidence that Greentree failed to contact medical, coupled with Plaintiff's admission that a nurse did come out to resolve the issue of his medications, Defendant Greentree will be granted summary judgment with respect to deliberate indifference.

Plaintiff also claims that Greentree wrote him a "falsified ticket for refusing housing, disobeying a direct order, after [he] declared a hunger strike" (Doc. 108-3 at 23:12-14). The ticket is not in the record but C.O. Greentree acknowledges it was written (Doc. 108-6 at ¶ 6).

A hunger strike may be protected under the First Amendment. *Stefanoff v. Hays County, Tex.,* 154 F.3d 523, 527 (5th Cir. 1998) (hunger strike may be protected activity if aimed at conveying a particularized message); see also, *Texas v. Johnson,* 491 U.S. 397, 403 (1989) (expressive conduct can be protected by First Amendment). Crediting Plaintiff's account, a jury could reasonably find that Greentree did not fill out the hunger strike forms and instead issued Plaintiff a disciplinary ticket to deter Plaintiff from engaging in hunger strikes. Therefore, Plaintiff's retaliation claim against Greentree survives summary judgment.

### Tony Harmon

Plaintiff alleges that Tony Harmon, a correctional officer at Lawrence, covered Plaintiff's cell door or window when Plaintiff complained about his health, and interfered with the nurses taking care of him by remaining present while they took his vitals. Plaintiff testified that C.O. Harmon would write down his vitals for the nurses, and Harmon corroborates that he has "assisted nurses by writing down vital signs on a separate paper" (Doc. 108-7 at ¶ 5). And the medical records indicate that Harmon took Plaintiff to R.N. Canada for treatment (Doc. 105-16, p. 24).

While Harmon's conduct may have arguably been inappropriate, "negligence, gross negligence, or even recklessness" is not sufficient to violate the Eighth Amendment. *Hildreth v. Butler,* 960 F.3d 420, 425-26 (7th Cir. 2020). Such "isolated instances of neglect are generally insufficient to support a claim of Eighth Amendment deliberate indifference." *Gutierrez v. Peters,* 111 F.3d 1364, 1374 (7th Cir. 1997). Based on the evidence in the record, C.O. Harmon will be granted summary judgment on Plaintiff's deliberate indifference claim against him.

### Qualified Immunity

This Court analyzes whether the retaliation claims against Defendants Brookhart and Greentree are barred by qualified immunity. Prison officials "are entitled to qualified immunity from liability arising out of conduct that does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Babcock v. White*, 102 F.3d 267, 276 (7th Cir. 1996). But Plaintiff had a clearly established right to be free from retaliation for exercising his First Amendment right to file grievances and engage in hunger strikes (as he intended them to affect his conditions of confinement). *DeWalt v. Carter,* 224 F.3d 607, 618 (7th Cir. 2000). Therefore, at the summary judgment stage, qualified immunity does not immunize the conduct of Defendants Brookhart and Greentree.

### Conclusion

For the foregoing reasons, the Motion for Summary Judgment of Defendants Trina Canada (Swinson), Carissa Lurking, Deena Seed, Vipin Shah, Amy Thurman, and Pam Ward (Doc. 104) is **GRANTED** in its entirety, and the Motion for Summary Judgment of Defendants Dee Dee Brookhart, Logan Greentree, and Tony Harmon (Doc. 108) is **GRANTED in part**.

**IT IS SO ORDERED.**

**DATED:  March 31, 2024**

**STACI M. YANDLE**
**United States District Judge**